[Cite as *State v. Williams*, 2021-Ohio-3491.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

State of Ohio,                              :

      Plaintiff-Appellee,           :

                                             No. 18AP-891

v.                                         :              (C.P.C. No. 17CR-6553)

Joseph L. Williams,                        :              (REGULAR CALENDAR)

      Defendant-Appellant.          :

---

D E C I S I O N

Rendered on September 30, 2021

---

**On brief:** [*Janet A. Grubb*, First Assistant Prosecuting Attorney], and *Seth L. Gilbert*, for appellee. **Argued:** *Seth L. Gilbert.*

**On brief:** *Yeura R. Venters*, Public Defender, and *Timothy E. Pierce*, for appellant. **Argued:** *Timothy E. Pierce.*

---

APPEAL from the Franklin County Court of Common Pleas

DORRIAN, P.J.

{¶ 1} Defendant-appellant, Joseph L. Williams, appeals from the October 17, 2018 judgment of the Franklin County Court of Common Pleas finding him guilty of two counts of murder with repeat-violent-offender specifications on each count and sentencing him to 15 years to life in prison plus 3 years for the repeat-violent-offender specification. For the following reasons, we affirm.

**I. Facts and Procedural History**

{¶ 2} In December 2017, appellant was indicted on two counts of murder in the death of William Taylor, which occurred at 43 1/2 Rodgers Avenue. Both counts included a repeat-violent-offender specification.

{¶ 3} The case proceeded to a jury trial beginning in September 2018. However, prior to commencing trial, the prosecution filed a motion to admit hearsay, pursuant to

Evid.R. 803(2), regarding three statements by Shirleen Henderson ("Shirleen") as excited utterance exceptions. The first was a statement to Officer Christopher Jones where Shirleen identified appellant as the perpetrator. The second was a statement made to Detective Timothy Mounts within an hour of the incident. The third statement involved comments by Shirleen made to her grandson. Shirleen passed away in December 2017. The trial court reserved ruling on the motion.

{¶ 4}   During voir dire, plaintiff-appellee, State of Ohio, used two peremptory strikes to dismiss two African-American jurors on the panel. (Juror Nos. 5 and 17.)[1] Appellant's counsel objected and raised challenges under *Batson v. Kentucky*, 476 U.S. 79 (1986). The trial court overruled the challenges and those two jurors were dismissed from the jury.

{¶ 5}   The first witness at trial was James Cobb, who lived at 43 1/2 Rodgers Avenue with his girlfriend, Pamela Henderson and her sister, Shirleen. On the morning of November 26, 2017, Cobb witnessed a fight occurring in his yard, on the side of his porch. He saw "[s]ome man beating Mr. Jake with some type of instrument of some type." (Tr. Vol. II at 106.) After witnessing the fight, Cobb went back inside and called 9-1-1. Cobb identified a picture of Taylor as the man he called "Mr. Jake." (Tr. Vol. II at 111.) Cobb could not identify the object used to beat Taylor or the man who beat him, but he did testify the man was African-American. He testified that "[t]hey told me that it was two brothers; but which one of them it might have been at that time, I don't know." (Tr. Vol. II at 109.) Cobb had seen the man the night before when "they was smoking and drinking." (Tr. Vol. II at 109.)

{¶ 6}   Barry Matthews, Shirleen's grandson, who lived at 43 Rodgers Avenue also testified. He heard his grandmother yelling so he stepped outside onto his porch and saw Jake on the ground. His grandmother appeared upset. Matthews heard his grandmother call police. Matthews saw appellant initially standing behind his grandmother on the porch of 43 1/2 Rodgers Avenue and then appellant walked around the house to Rodgers Avenue. Matthews identified appellant in court as the man he saw in the backyard. Police were arriving as appellant attempted to walk away.

---

[1] During voir dire, after Prospective Juror No. 9 was excused, Prospective Juror No. 17 moved into the No. 9 spot. Nevertheless, throughout this decision, we will continue to refer to Prospective Juror No. 17 as Prospective Juror No. 17.

{¶ 7} Columbus Police Officer Christopher B. Jones, now Detective, responded to a dispatch from a 9-1-1 call regarding a fight between two males, one with a pipe in the street. He arrived at 43 Rodgers Avenue in less than one minute, probably within 10-30 seconds. He saw a male walking his dog on Rodgers Avenue and a male on the front porch of 43 Rodgers Avenue. Officer Jones asked them if they had seen a fight in the middle of the street, which they denied. During that time, an African-American male walked between the houses and started northbound down the street on the sidewalk. Officer Jones heard "a female's voice frantically talking in the back about an ambulance." (Tr. Vol. II at 203.) At that point, he saw a white male face down on his knees with a female standing over him so he started running northbound on Rodgers Avenue after the male that had walked past him as he arrived. Officer Jones identified appellant as the male he detained. After he placed appellant in the cruiser, the female he had seen in the backyard came out to the sidewalk. She appeared "[n]ervous, shaken, just (indicating) -- I mean, just -- her whole body was just kind of one of those, like she had just seen something that was just bad." (Tr. Vol. II at 210.) When asked if "she appear[ed] to be under the excitement of just witnessing a startling event," Officer Jones responded, "I would say yes." (Tr. Vol. II at 210.) Defense counsel objected on grounds of leading the witness.

{¶ 8} Officer Jones then testified that the woman "said, 'You got the right one,' and was pointing towards the cruiser where the individual was sitting." (Tr. Vol. II at 212.) Officer Jones identified the woman as Shirleen. After several more minutes of questioning, when the prosecutor finished questioning Officer Jones, defense counsel "renew[ed] [his] objection" with no explanation or argument. (Tr. Vol. II at 217.) The objection regarding leading the witness was the only objection made during the direct examination of Officer Jones.

{¶ 9} Columbus Police Officer Geffrey Kinzel testified that when he arrived at the scene, Officer Jones already had a suspect in custody. The suspect was then placed in Officer Kinzel's cruiser. The parties stipulated that the suspect was appellant. (Tr. Vol. II at 271.) When asked identifying information, appellant gave Officer Kinzel the name of his twin brother, Patrick, three or four times. Eventually, Officer Kinzel was able to find appellant's correct identity and a corresponding picture of appellant.

{¶ 10} Detective Donald Jones of the crime scene search unit testified the crime scene was relatively small, and he collected only five pieces of physical evidence from the

scene. Deputy Coroner John A. Daniels, M.D., testified the cause of death was blunt impact or blunt force injuries of the head. (Tr. Vol. III at 124.) Several stipulations were entered into evidence, including that Detective Jones collected one wooden board and pieces of board from the crime scene. The DNA analysis conducted on the wood tested negative for blood, the blood on appellant's pants was inconclusive, and appellant's sweatshirt, vest, shirt, and shoes were inconclusive. The final stipulation was the victim died on November 27, 2017 at 12:13 p.m.

{¶ 11} Deputy Sheriff Alan Maines testified that he works in the Deerfield Township Post, which is the area surrounding Mason, Ohio. On November 3, 2017, he took a stolen vehicle report from a male, who identified himself as Patrick Williams. The male told the deputy that he had driven from Columbus with another male. They stopped at a Lowe's and went inside the store. When appellant returned outside, the other male had stolen the vehicle and left him stranded. The vehicle was registered in the name of Pamela Robinson, who was appellant's girlfriend. Inside the vehicle was appellant's wallet, cell phone, and tools. However, "Joseph L. Williams" signed the police report and Deputy Maines identified appellant as the man who reported the vehicle stolen. (Tr. Vol. III at 166.)

{¶ 12} Grove City Police Officer Eric Parker testified that on November 8, 2017, he stopped a vehicle for an incorrect turn. The driver was Taylor. Inside the vehicle were two credit cards and a social security card belonging to Joseph L. Williams and two credit cards belonging to Ida Jane Price. There was a COTA bus pass and a library card with the name Justin Brower. Officer Parker testified that Brower is possibly Pamela Robinson's son. As a result of the traffic stop, Taylor was charged with receiving stolen property, possession of drug paraphernalia, no operator's license, and an improper turn.

{¶ 13} Columbus Police Detective Timothy Mounts, the primary detective assigned to this case, testified and listened while the prosecutor played several telephone calls placed from the jail.[2] Detective Mounts identified appellant as the speaker on the calls. After the prosecution rested, defense counsel made a Crim.R. 29 motion, which the trial court denied.

{¶ 14} Appellant also testified. He stated that he used crack cocaine periodically for years. Appellant stated that approximately one month before Taylor died, appellant met

---

[2] Richard Clark, the person who monitors all Franklin County inmate telephone calls testified regarding the foundation for the recordings of the telephone calls played for the jury.

him at the casino when Taylor approached him in the parking lot and asked for help with his vehicle. Appellant believed Taylor was a subcontractor and had work for him in Mason, so they drove there. Since appellant's driver's license was suspended, Taylor drove. They stopped at a Lowe's and Taylor left in the vehicle and appellant was stranded. The vehicle contained his wallet with cash, cell phone, power tools, and mementos his girlfriend had of her late mother. He filed a police report. The car was recovered approximately one week later.

{¶ 15} Approximately four or five days after the car was recovered, appellant saw Taylor at 43 1/2 Rodgers. He stated he "resolve[d] things with [Taylor], but I will never forgive him." (Tr. Vol. IV at 226.)

{¶ 16} On the morning of November 26, 2017, appellant arrived at 43 1/2 Rodgers at approximately 6:15 a.m. He parked his car on Scott Street, one block north of 43 Rodgers and entered through the back alley. He bought some drugs and went upstairs. He stated he "partied for about two hours. I sat down afterwards, after partying; sat down meditating, listening to my phone, listening to some YouTube, some jazz, and it would take me back and you know, put me back in certain mind and get myself calmed down so I can go home because I didn't get high in the day." (Tr. Vol. IV at 231.)

{¶ 17} Appellant testified he was falling asleep but heard screaming. He went downstairs and saw Shirleen on the porch and he stood behind her. He saw an individual "balled up in a fetal position" by the fence. (Tr. Vol. IV at 232.) Shirleen called 9-1-1. He immediately began to leave and walked to the front of the houses. As he walked by the victim, he saw the tattoo and realized it was Taylor. He saw a police officer in front of 43 Rodgers and Matthews was standing on the porch. He started to walk down the street because he had some warrants out for his arrest. He lied to police because of the warrants. Appellant denied causing Taylor's death and denied being in a "tussle" with anyone. (Tr. Vol. IV at 246; 249.)

{¶ 18} Appellant identified Shirleen's voice on the 9-1-1 call. During the call, Shirleen was asked if she knew what happened to Taylor, she answered, "[n]o." (Tr. Vol. V at 24-25.)

{¶ 19} The prosecution and the defense both played tapes of telephone calls appellant made from the jail. Every inmate call is recorded. In telephone call 80 on December 15, 2017, at 12:52 p.m., appellant stated, "I re-explained the whole story to them,

and I explained how I was caught. You know, explained this man would pull a blade out on me, know what I'm saying? Man pulled a blade out on me, you know. So point blank. It's just point blank. That's what it was." (Tr. Vol. V at 57.) In a telephone call two days after his arrest appellant stated, "All I can remember is just looking at that mother-fucker." (Tr. Vol. IV at 69, Call 2, Nov. 28, 2017, 9:48 a.m.) In another call, appellant stated, "It is what it is. If I had to do it again, I would. You know, especially somebody fucking over me and mine. You know? I'd do it again. You know, with a gun, you know, all that. Use my hands and my feet. It is what it is. Okay?" (Tr. Vol. IV at 71, Call 11, Nov. 29, 2017, 8:27 a.m.) In another call, appellant stated:

> Only part that's really hurting me was, a lot of times, when I thought about when I was doing what I was doing, about everything was going on. Everything. The memories, you know, and calling that to my head when I was doing what I was doing, you understand what I'm saying?
>
> I just -- no, hell no. If my bitch -- excuse my language, but my b-shit -- no. You know, all her memories and everything. I'm telling you, and I know everything that I said when I was doing what I did. You know. All these memories, you know, all my shit, you know, the tools and stuff I had there, just everything. You know, everything. I'm just saying, that's what -- and then the last thing was this piece of metal and knock, knock, knock him dead out. You know."

(Tr. Vol. IV at 54, Call 31, Dec. 3, 2017, 9:52 a.m.)

{¶ 20} In a telephone call to the Grove City Police Department, appellant stated that he was incarcerated because he had been in an "altercation." (Tr. Vol. IV at 63, Call 194, Jan. 3, 2018, 9:18 a.m.)

{¶ 21} The jury found appellant guilty on both murder counts and the trial court found him guilty of the repeat-violent-offender specifications. The trial court merged Count 1 into Count 2 and sentenced appellant to 15 years to life on the murder count, to be served consecutively to 3 years on the repeat-violent-offender specification. The trial court ordered the sentence to be served concurrently to an 11-month sentence for cocaine possession in an unrelated case.

## II. Assignments of Error

{¶ 22} On November 21, 2018, appellant filed a motion for leave to file a delayed appeal, which this court granted. *See State v. Williams,* 10th Dist. No.18AP-891 (Dec. 4,

2018) (Journal Entry.) Appellant appeals and assigns the following three assignments of error for our review:

> [I.] The lower court clearly erred in allowing the prosecution to exercise peremptory strikes against prospective African-American jurors in violation of Appellant's rights under the Fifth, Sixth, and Fourteenth Amendments of the United States Constitution; Article I, Sections 1, 2, and 16 of the Ohio Constitution; R.C. 2313.12; Franklin County Common Pleas Court Local Rule 27.01(A); and *Batson v. Kentucky*, 476 U.S. 79 (1986).
>
> [II.] The lower court erred in admitting the hearsay assertions of Shirleen Henderson informing Chris Jones that Appellant was responsible for William Taylor's injuries. The court's ruling violated Evid.R. 602, 802 and 803(2) and Appellant's right to a fair trial under the Sixth and Fourteenth Amendments of the United States Constitution and Article I, Sections 10 and 16 of the Ohio Constitution.
>
> [III.] The Appellant's convictions are against the sufficiency and manifest weight of the evidence.

For ease of discussion, we address appellant's assignments of error out of order.

## III. Analysis

{¶ 23} By his first assignment of error, appellant contends the trial court erred in allowing the prosecution to exercise peremptory strikes against prospective African-American jurors in violation of his constitutional rights. In analyzing the trial court's actions in considering a *Batson* claim, a reviewing court must determine whether the trial court's analysis of the contested strike was sufficient to preserve a constitutionally permissible jury selection process. *Hicks v. Westinghouse Materials Co.*, 78 Ohio St.3d 95, 99 (1997).

{¶ 24} Ordinarily, a prosecutor may exercise a peremptory challenge "for any reason, or no reason at all." *Hernandez v. New York*, 500 U.S. 352, 374 (1991) (O'Connor, J. concurring). "Under well-established principles of equal protection jurisprudence, * * * a peremptory challenge may not be used purposefully to exclude members of a cognizable racial group from jury service solely on the basis of their race." *State v. Powers*, 92 Ohio App.3d 400, 405 (10th Dist.1993), citing *Powers v. Ohio*, 499 U.S. 400 (1991) and *Batson*. In *Batson*, the United States Supreme Court set the " 'three-part process for evaluating claims that a prosecutor used peremptory challenges in violation of the Equal Protection

Clause.' " *State v. Massalay*, 10th Dist. No. 15AP-544, 2016-Ohio-779, ¶ 45, quoting *Miller-El v. Cockrell*, 537 U.S. 322, 328 (2003).

{¶ 25} Initially, under the first prong, a defendant must make a prima facie case that the prosecutor is engaged in racial discrimination. *Batson* at 96. "To meet the first prong of a *Batson* challenge and establish a prima facie case of purposeful discrimination in the prosecution's exercising its peremptory challenges, a defendant must demonstrate: (1) the prosecution peremptorily challenged members of a cognizable racial group; and (2) the facts and any other relevant circumstances raise an inference that the prosecution used the peremptory challenges to exclude jurors on account of their race." *State v. Berry*, 10th Dist. No. 18AP-9, 2019-Ohio-3902, ¶ 12, citing *State v. Jennings*, 10th Dist. No. 09AP-70, 2009-Ohio-6840, ¶ 21.

{¶ 26} Second, under the second prong, if a defendant satisfies that burden, the prosecutor must present a racially neutral explanation for the challenge. *Batson* at 97. In order to meet this burden, the prosecution " 'must give a clear and reasonably specific explanation of [its] legitimate reasons for exercising the challenge.' " *Berry* at ¶ 13, quoting *Batson* at 98, fn. 20. (Internal citations and quotations omitted.) However, the " 'race-neutral explanation need not rise to the level of a challenge for cause.' " *Id.*, quoting *Jennings* at ¶ 18, citing *State v. Cook*, 65 Ohio St.3d 516, 519 (1992), citing *Batson* at 96-98. "Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral." *Hernandez* at 360. "The critical issue is whether discriminatory intent is inherent in counsel's explanation for use of the strike; intent is present if the explanation is merely a pretext for exclusion on the basis of race." *Hicks* at 98, citing *Hernandez* at 363.

{¶ 27} "Finally, [under the third prong,] the court must decide, based on all the circumstances, whether the defendant has proved purposeful racial discrimination." *State v. Johnson*, 144 Ohio St.3d 518, 2015-Ohio-4903, ¶ 21, citing *Batson* at 98. " 'In doing so, the court must consider the circumstances of the challenge and access [sic] the plausibility of the prosecutor's explanation in order to determine whether it is merely pretextual.' " *Massalay* at ¶ 45, quoting *Johnson* at ¶ 21, citing *Miller-El* at 328, and *State v. Frazier*, 115 Ohio St.3d 139, 2007-Ohio-5048, ¶ 65. "In short, the trial court must decide whether the prosecutor's reason is credible." *State v. Thompson*, 141 Ohio St.3d 254, 2014-Ohio-4751, ¶ 62.

{¶ 28} As we begin our analysis of the *Batson* prongs, we are mindful of our standard of review. In *Massalay*, the Supreme Court of Ohio stated:

> " 'The ultimate burden of persuasion regarding racial motivation rests with, and never shifts from, the opponent of the strike.' " *State v. Jennings*, 10th Dist. No. 09AP-70, 2009-Ohio-6840, ¶ 22, quoting *Purkett v. Elem*, 514 U.S. 765, 768 (1995). "Because the issue of discriminatory intent often turns on the prosecution's credibility, it is 'a finding of fact of the sort accorded great deference on appeal.' " *Id.*, quoting *Hernandez v. New York*, 500 U.S. 352, 364-65 (1991). "Accordingly, '[a] trial court's findings of no discriminatory intent will not be reversed on appeal unless clearly erroneous.' " *Thompson* at ¶ 53, quoting *State v. Bryan*, 101 Ohio St.3d 272, 2004-Ohio-971, ¶ 106. Where an appellant questions the trial court's proper analysis of a *Batson* challenge, no clear error occurs where the appellate court can determine from the record that "the trial judge's analysis of the contested peremptory strike was sufficient to preserve a constitutionally permissible jury-selection process." *Hicks v. Westinghouse Materials Co.*, 78 Ohio St.3d 95, 99-102 (1997) (finding trial court's ruling, "while imperfect in form," did not ultimately unconstitutionally compromise the integrity of the jury selection process).

*Id.* at ¶ 47.

{¶ 29} We now outline the entirety of the parties' and the court's discussion of the peremptory challenges at issue here. The prosecution used its first peremptory challenge to dismiss Prospective Juror No. 5. The defense raised an objection, as follows:

> [Defense counsel]: Your Honor, I'm forced to make a Batson challenge at this time. This is an African American juror, and I object to their exclusion from this jury on that basis. Need I make further arguments? I'm making a Batson challenge here.

[Prosecutor]: Your Honor, I would just note that a Batson challenge, number one, requires a pattern.[3] This is my first excuse, and I do have a prima facie, race-neutral reason why I'm excusing [Prospective Juror No. 5].

THE COURT:  Okay.  So the objection will be overruled.

(Tr. Vol. I at 176-77.)  Prospective Juror No. 5 was excused.  After the prosecution used its second and third peremptory challenges, Prospective Juror No. 17 moved into the No. 9 spot.  The prosecution then used its final peremptory challenge to excuse Prospective Juror No. 17.  The defense raised an objection, as follows:

[Defense counsel]: I'm going to renew my Batson challenge as an objection, for the record.

[Prosecutor]: And your Honor, in response, I didn't put this on the record but I should have. I excused [Prospective Juror No. 5] because of her responses to my question in regard to the proof beyond a reasonable doubt, she did believe that I should have to prove the case beyond all reasonable doubt.

With regard to [Prospective Juror No. 17] the reason I'm excusing [Prospective Juror No. 17] is her responses to my question about the one-witness rule and she believed that there needed to be much more than one witness.  Thank you.

THE COURT:  The objection will be overruled.

(Tr. Vol. I at 179-80.)

{¶ 30} Regarding the first prong of *Batson*, appellant argues that whether a prima facie case existed in this case is moot and this court need not consider it.  Relying on *Hernandez* and *State v. White*, 85 Ohio St.3d 433, 437 (1999), appellant asserts the

---

[3] We note that although, in response to appellant's *Batson* challenge to Prospective Juror No. 5, the prosecutor initially responded that a pattern was needed to establish a prima facie case, the state concedes before this court that a pattern is not necessary. (*See* Appellee's Brief at 19.) We agree that a pattern is not necessary and observe that the Supreme Court of Ohio in *State v. White*, 85 Ohio St.3d 433, 437 (1999), rejected the contention that in order to prevail on a *Batson* claim, a defendant must show the existence of a pattern of peremptory challenges by the state against members of the group in question. The court recognized that " 'the exercise of *even one* peremptory challenge in a purposefully discriminatory manner would violate equal protection.' " (Emphasis sic). *White* at 436, quoting *State v. Ellison*, 841 S.W.2d 824, 827 (Tenn.1992). The court in *White* held: "The existence of a pattern of discriminatory strikes is *not* a prerequisite either to finding a prima facie case in step one of the *Batson* analysis or to finding actual discrimination in step three. Such a rule would ignore *Batson*'s requirement that the trial court consider *all* the circumstances in determining whether racial discrimination occurred. It would also mean that no *Batson* challenge could succeed unless the prosecutor challenged more than one member of the group in question. Such a rule would license prosecutors to exercise one illegal peremptory strike per trial. The law of equal protection does not allow 'one free bite.' " (Emphasis sic.) *Id.*

question of whether a prima facie case was established becomes moot and need not be addressed when the prosecution provides explanations for the strike despite the absence of a request from the trial court. *See White* at 437. With regard to Prospective Juror No. 5, the state argues on the merits that the defense failed to show any inference of racial discrimination by stating only that the juror was African-American and that such fact alone does not suffice. With regard to Prospective Juror No. 17, the state concedes mootness with regard to whether a prima facie case existed. We agree an examination of the first prong of *Batson* is moot. Because the prosecutor provided explanations for the strike without prompting by the trial court and the trial court ruled on the ultimate issue of discrimination in this case, the issue of whether appellant has made a prima facie showing of racial discrimination is moot. Thus, we will move directly to an examination of the race-neutral bases articulated by the state.

{¶ 31} Regarding the second prong of *Batson*, appellant argues the state's reason for challenging Prospective Juror No. 5 "implies race neutrality" and was "technically race neutral" yet asserts that the reason was really based on the juror's "*correct*" understanding of the burden of proof standard and therefore " 'raises more concerns than it puts to rest.' " (Emphasis sic.) (Appellant's Brief at 47-48, quoting *Holloway v. Horn*, 355 F.3d 707, 724 (3d Cir.2004); Appellant's Reply Brief at 7.) The state points out that appellant's assertion that Prospective Juror No. 5's understanding of the burden of proof standard was correct was premised on the juror's silence[4] and that the juror's affirmative statement on the record

---

[4] Appellant argues that "the record *does not reflect* that once [Prospective Juror No. 5] was informed of the correct standard she stubbornly adhered to her earlier misapprehension of the proof metric." (Emphasis sic.) (Appellant's Brief at 50.) Appellant contends the prosecutor should have returned to questioning this juror and inquired further. Appellant then argues that the prosecution's misstatement when articulating the basis for the strike demonstrates the prosecutor acknowledged Prospective Juror No. 5's correct understanding of the burden of proof. Appellant argues the prosecutor posed no further questions to Prospective Juror No. 5 after explaining the burden of proof. Instead, the prosecutor asked the entire panel of jurors whether anyone would hold the prosecutor to a higher burden of proof than instructed by the trial court. Appellant contends nothing in the record indicates that Prospective Juror No. 5 had not been rehabilitated. However, appellant cites case law from Colorado and Missouri for the proposition that a silent record supports the conclusion that a juror has been rehabilitated. *See Colorado v. Clemens*, 2017 CO 89 (2017); *Edgar v. Missouri*, 145 S.W.3d 458 (2004). He does not point us to any Ohio case law stating the same nor has our research revealed any. Rather, our case law holds that the "ultimate burden of persuasion regarding racial motivation rests with, and never shifts from, the opponent of the strike." *State v. Gowdy*, 88 Ohio St.3d 387, 393 (2000), citing *Purkett v. Elem*, 514 U.S. 765, 768 (1995). The silent record of this case does not indicate that rehabilitation of Prospective Juror No. 5 was accomplished nor that the prosecutor's given reason was not race-neutral. Furthermore, Ohio courts have found that a peremptory strike of a juror who believed the state had to prove guilt by a burden of proof higher than beyond a reasonable doubt was a race-neutral basis. *See State v. Hodge*, 10th Dist. No. 18AP-95, 2019-Ohio-4012, ¶ 8; *State v. Davis*, 9th Dist. No. 25826, 2012-Ohio-1440, ¶ 10-15; *State v. Wright*, 7th Dist. No. 03 MA 112, 2004-Ohio-6802, ¶ 18-24.

was that the state must prove guilt beyond "all" doubt. *See infra* Tr. Vol. I at 70. Appellant argues that, pursuant to the second prong of *Batson*, the state's reason for challenging Prospective Juror No. 17 "appeared race neutral." (Appellant's Brief at 54.) The state argues the issue when examining the second prong is " 'the facial validity of the prosecutor's explanation. Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral.' " (State's Brief at 24, quoting *Hernandez* at 360.)

{¶ 32} The prosecutor's peremptory challenge to Prospective Juror No. 5 was based on the following exchange:

> [Prosecutor]: So when we talk about proof beyond a reasonable doubt, what does that mean to you? Do you have - -- can you say, just in general terms, what that means to you? Do you think it means proof beyond *all* doubt?
>
> [Prospective Juror No. 5]: Yeah.
>
> [Prosecutor]: Yeah? Okay.

(Emphasis added.) (Tr. Vol. I at 70.)

{¶ 33} Despite the prosecutor's reference to "beyond all reasonable doubt" while providing her race-neutral basis, both the trial court and defense counsel appeared to understand that the prosecutor was referring to the earlier exchange where the juror answered "[y]eah" when asked directly whether proof beyond a reasonable doubt meant "proof beyond all doubt." (Tr. Vol. I at 70.)

{¶ 34} The prosecutor's peremptory challenge to Prospective Juror No. 17 was based on the following exchange:

> [Prosecutor]: What if the person gave you no reasonable doubt? Let's take the ATM attack scenario. And the victim of that ATM attacker, says, "This is what he was wearing; this is what I know; this is what happened; I see him in the courtroom, that's him.
>
> [Prospective Juror No. 17]: Unfortunately, knowing people, people are flawed, and they don't always -- aren't always 100-percent correct. Somehow, you know, that person has the other side, too. Did they have a[n] alibi, something else going on. Did you see me walk past you while I was at the ATM, now you're blaming me for the crime. Just, for me.

[Prosecutor]: I see what you're saying here. Let's say that you believe everything she's saying. That you believe she is telling the truth, that she says that was him. "I was two, you know, two feet away from him; I got a good look at him; it was lit; I could see his face; I could see his eyes; I know that was him," and you believed her. Would that be enough for you?

[Prospective Juror No. 17]:  No.

(Tr. Vol. I at 102-03.)

{¶ 35}  In *Purkett v. Elem*, 514 U.S. 765, 767-68 (1995), the United States Supreme Court instructed that the second prong of *Batson* does not demand an explanation that is persuasive, or even plausible.  "It is not until the *third* step that the persuasiveness of the justification becomes relevant -- the step in which the trial court determines whether the opponent of the strike has carried his burden of proving purposeful discrimination."  *Id.*, citing *Batson* at 98; *Hernandez* at 359 (plurality opinion).  In *Hernandez*, the United States Supreme Court held regarding the second prong of *Batson* that "[a] neutral explanation in the context of our analysis here means an explanation based on something other than the race of the juror.  At this step of the inquiry, the issue is the facial validity of the prosecutor's explanation.  Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral."  *Hernandez* at 360.

{¶ 36}  We find both with regard to Prospective Juror No. 5 and Prospective Juror No. 17 that the prosecutor articulated race-neutral reasons for excusing those two prospective jurors.

{¶ 37}  Regarding the third prong of *Batson*, we note that the crux of appellant's argument and thus our analysis focuses here.  We have already determined that our analysis of the first prong of *Batson* was moot, and the state met the second prong of *Batson*. Regarding the third prong, appellant argues the trial court erred, with respect to Prospective Juror No. 5 when: (1) it summarily overruled appellant's *Batson* challenge, (2) it simply accepted the state's rationale for the strike without meaningfully considering it, and (3) it combined steps two and three and denied the defense an opportunity to rebut the plausibility of the reasons submitted by the state.  Appellant argues the trial court erred with respect to Prospective Juror No. 17 when it combined steps two and three by its summary denial which also precluded defense counsel from responding to the prosecutor's explanation.

{¶ 38} In *State v. Adams*, 144 Ohio St.3d 429, 2015-Ohio-3954, ¶ 160, the Supreme Court of Ohio held regarding the third prong of a *Batson* challenge, that the trial court must determine, based on all the circumstances, whether the party opposing the peremptory challenge has proved purposeful discrimination. *Id.*, citing *State v. Were*, 118 Ohio St.3d 448, 2008-Ohio-2762, ¶ 61. It further held the trial court may express its opinion of the state's race-neutral justification in the form of a clear rejection of the *Batson* challenge, without offering detailed findings, "[a]s long as [the] trial judge affords the parties a reasonable opportunity to make their respective records." (Internal quotations omitted.) *Adams*[5] at ¶ 160, quoting *Frazier* at ¶ 98, quoting *Messiah v. Duncan*, 435 F.3d 186, 198 (2d Cir.2006).

{¶ 39} Here, appellant argues the trial court's abbreviated ruling is not entitled to deference. He posits now that the state's explanations were pretextual because: (1) the peremptory challenge to Prospective Juror No. 5 was based on a momentary misunderstanding of the reasonable doubt standard prompted by a leading question and that Prospective Juror No. 5 eventually grasped the correct standard, and (2) the peremptory challenge to Prospective Juror No. 17 was based on the juror's understanding of the "one witness" instruction, that other jurors expressed the same skepticism but were not removed and the state never returned to Prospective Juror No. 17 to determine if the juror could be rehabilitated. Appellant argues the trial court blended steps two and three of *Batson* and precluded defense counsel from responding to the prosecutor's explanation of its reasons for exercising the peremptory challenges.

{¶ 40} The record reflects the parties' and trial court's discussion of the peremptory challenges were brief and the trial court's ruling was indeed direct. Nevertheless, we cannot conclude that the trial did not afford the parties a reasonable opportunity to make their respective records. Notwithstanding the arguments he makes now—that the state's reasons were pretextual—appellant did not make any such arguments before the trial court. He simply offered that the challenged jurors were African-American and he objected on that

---

[5] In *Adams*, without elaborating on how the trial court permitted the parties to make a record, the Supreme Court rejected a *Batson* challenge noting "[t]he trial court clearly rejected Adams's *Batson* challenges as to both prospective jurors after permitting the parties to make a record. As to prospective juror No. 11, the judge stated 'Okay. That is a race-neutral reason. Your *Batson* challenge is overruled.' The trial court was just as unequivocal when discussing the *Batson* challenge to prospective juror No. 31: '[I]t's a racially-neutral reason. There were complaints about her from the beginning by the state, so I assumed the state was going to do that.' " *Adams* at ¶ 161.

basis. Defense counsel then stated "[n]eed I make further arguments?" and when the prosecutor immediately interjected to offer its reasons for the challenge, defense counsel did not follow-up to inquire of the court's response to its question if he needed to make further arguments. (Tr. Vol. I at 176-77.) Defense counsel also did not offer any argument for the court to consider assessing the plausibility of the prosecutor's explanation in order to determine whether it is merely pretextual. Defense counsel made no argument regarding the credibility of the prosecutor's reasons. Finally, defense counsel did not ask for an additional opportunity to make a record or argument, or follow-up or object in any way when the trial court overruled his objections.

{¶ 41} In *Johnson*, the Supreme Court of Ohio rejected Johnson's argument that a trial court must undertake its own investigation of a prosecutor's race-neutral explanation, even if the defense has not challenged that explanation in any way. *Id.* at ¶ 22. *Johnson* held "neither this court nor the United States Supreme Court has imposed 'a duty on the trial court to conduct an independent inquiry into the relevant facts and circumstances bearing on the credibility of the prosecution's stated reasons.' " *Id.*, quoting *United States v. Houston*, 456 F.3d 1328, 1338-39 (11th Cir.2006). Furthermore, in *Massalay* this court held "[t]he ultimate burden of persuasion regarding racial motivation rests with, and never shifts from, the opponent of the strike." (Internal quotations omitted.) *Id.* at ¶ 47, quoting *Jennings* at ¶ 22, quoting *Purkett* at 768.

{¶ 42} On the record of this case, we cannot say appellant prevailed in his ultimate burden of persuasion regarding racial motivation and, thus, we cannot find the trial court's decisions to overrule appellant's *Batson* challenges were clearly erroneous.

{¶ 43} Accordingly, the first assignment of error is overruled.

{¶ 44} We turn now to the third assignment of error. In his third assignment of error, appellant contends the convictions are not supported by sufficient evidence and are against the manifest weight of the evidence. Sufficiency of the evidence is a legal standard that tests whether the evidence introduced at trial is legally adequate to support a verdict. *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997). Whether the evidence is legally sufficient to support a verdict is a question of law. *Id.* In determining whether the evidence is legally sufficient to support a conviction, " '[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.' " *State*

*v. Robinson*, 124 Ohio St.3d 76, 2009-Ohio-5937, ¶ 34, quoting *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus.  A verdict will not be disturbed unless, after viewing the evidence in the light most favorable to the prosecution, it is apparent that reasonable minds could not reach the conclusion reached by the trier of fact.  *State v. Treesh*, 90 Ohio St.3d 460, 484 (2001).

{¶ 45}  The weight of the evidence "concerns 'the inclination of the *greater amount of credible evidence*, offered in a trial, to support one side of the issue rather than the other.' "  (Emphasis sic.)  *Thompkins* at 387, quoting *Black's Law Dictionary* 1594 (6th Ed.1990).  Although there may be sufficient evidence to support a judgment, a court may nevertheless conclude that a judgment is against the manifest weight of the evidence.  *Id.*

{¶ 46}  When presented with a challenge to the manifest weight of the evidence, an appellate court may not merely substitute its view for that of the trier of fact, but must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.  *Id.* at 387.  An appellate court should reserve reversal of a conviction as being against the manifest weight of the evidence for only the most " 'exceptional case in which the evidence weighs heavily against the conviction.' "  *Id.*, quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist.1983).

{¶ 47}  In addressing a manifest weight of the evidence argument, in conducting our review, we are guided by the presumption that the trier of fact " 'is best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony.' "  *Id.*, quoting *Seasons Coal Co., Inc. v. Cleveland*, 10 Ohio St.3d 77, 80 (1984).  Accordingly, we afford great deference to the jury's determination of witness credibility.  *State v. Redman*, 10th Dist. No. 10AP-654, 2011-Ohio-1894, ¶ 26, citing *Jennings* at ¶ 55.

{¶ 48}  Appellant argues the state presented insufficient evidence that he committed the offense.  The testimonies of Cobb, Matthews, and Officer Jones placed appellant at the scene.  Officer Jones' testimony regarding Shirleen's statement indicated that appellant committed the offense.  However, appellant admitted he was at the scene and his telephone calls from jail are evidence that he committed the offense.  In telephone call 80 on December 15, 2017, at 12:52 p.m., appellant stated, "I * * *  explained this man would pull

a blade out on me, know what I'm saying?  Man pulled a blade out on me, you know."  (Tr. Vol. V at 57.)  In a telephone call two days after his arrest, appellant stated "[a]ll I can remember is just looking at that mother-fucker."  (Tr. Vol. IV at 69, Call 2, Nov. 28, 2017, 9:48 a.m.)  In another call, appellant stated: "[i]t is what it is.  If I had to do it again, I would.  You know, especially somebody fucking over me and mine.  You know?  I'd do it again.  You know, with a gun, you know, all that.  Use my hands and my feet.  It is what it is.  Okay?"  (Tr. Vol. IV at 71, Call 11, Nov. 29, 2017, 8:27 a.m.)  In another call, appellant stated, "then the last thing was this piece of metal and knock, knock, knock him dead out.  You know."  (Tr. Vol. IV at 54, Call 31, Dec. 3, 2017, 9:52 a.m.)  Finally, appellant admitted in a telephone call to the Grove City Police Department, that he was incarcerated because he had been in an "altercation."  (Tr. Vol. IV at 63, Call 194, Jan. 3, 2018, 9:18 a.m.)

{¶ 49}  Construing this evidence in a light most favorable to the state, a rational jury could conclude appellant caused Taylor's death.

{¶ 50}  Appellant argues the verdict is against the manifest weight of the evidence because he testified he resolved his differences with Taylor and denied harming him.  However, a defendant is not entitled to a reversal on manifest weight grounds merely because conflicting or inconsistent evidence was presented at trial.  *State v. Peterson*, 10th Dist. No. 12AP-646, 2013-Ohio-1807, ¶ 15, citing *State v. Gravely*, 188 Ohio App.3d 825, 2010-Ohio-3379, ¶ 45 (10th Dist.).  Neither is a conviction against the manifest weight of the evidence because the trier of fact believed the state's version of events over the defendant's version.  *Id.* at ¶ 15, citing *State v. G.G.*, 10th Dist. No. 12AP-188, 2012-Ohio-5902, ¶ 7.  The trier of fact may take note of inconsistencies at trial and resolve them accordingly, "believ[ing] all, part, or none of a witness's testimony."  *State v. Fabal*, 10th Dist. No. 20AP-86, 2021-Ohio-1793, ¶ 40, citing *State v. Moore*, 10th Dist. No. 19AP-464, 2021-Ohio-1379, ¶ 34.

{¶ 51}  The jury heard both the state's and appellant's version of events.  The jury evaluated the weight and credibility of each witness and could have believed appellant was not the one who had harmed Taylor.  The jury instead chose to believe the state's version of events.  Because the jury could properly believe the state's witnesses, and because the jury is in the best position to determine the credibility of each witness by considering inconsistencies, as well as witnesses' manner and demeanor, on this record we cannot conclude the jury lost its way.  The verdict is not against the manifest weight of the evidence.

{¶ 52} Accordingly, appellant's third assignment of error is overruled.

{¶ 53} In his second assignment of error, appellant contends the trial court erred in admitting the hearsay assertions of Shirleen informing Officer Jones that appellant was responsible for Taylor's injuries. Appellant asserts the trial court's ruling violated Evid.R. 602, 802, and 803(2) and appellant's constitutional right to a fair trial.

{¶ 54} Prior to the beginning of trial, the state filed a motion to admit Shirleen's out-of-court statements under Evid.R. 803(2). The defense filed a memorandum contra. The trial court addressed the motion after voir dire. The prosecutor argued the state was seeking to admit three statements: (1) Shirleen's statement to Officer Jones when she pointed at appellant and stated "You got the right one," (2) Shirleen's statements during an interview within an hour of the incident, and (3) Shirleen's statements to Matthews during the incident. (Tr. Vol. II at 212.)

{¶ 55} After counsels' arguments, the trial court took the matter under advisement. After the first two witnesses testified, the trial court held that the admissibility of Shirleen's first statement depended on Officer Jones' testimony, that the second statement to detectives was inadmissible and the state did not seek to admit Shirleen's statements to Matthews. Thus, the only statement at issue is Shirleen's statement to Officer Jones while pointing at appellant in the cruiser.

{¶ 56} Appellant argues that the statement does not qualify as an excited utterance since during her 9-1-1 call, Shirleen responded "No" when asked by the operator if she knew how Taylor received his injuries. Further, appellant contends he objected repeatedly and, thus, preserved the issue for appellate review.

{¶ 57} "Ordinarily, we review a trial court's hearsay rulings for an abuse of discretion." *State v. McKelton*, 148 Ohio St.3d 261, 2016-Ohio-5735, ¶ 97, citing *State v. Hymore*, 9 Ohio St.2d 122, 128 (1967). An appellate court will not disturb such an evidentiary ruling absent a clear abuse of discretion and a showing that the appealing party was materially prejudiced by the ruling. *State v. Parham*, 10th Dist. No. 16AP-826, 2019-Ohio-358, ¶ 50. The state contends appellant failed to renew his objection contemporaneously with the testimony and failed to preserve the issue for appeal, thus the plain-error standard pursuant to Civ.R. 52(B) applies. An alleged error constitutes plain error only if the error is obvious and, but for the error, the outcome of the trial clearly would have been different. *State v. Yarbrough*, 95 Ohio St.3d 227, 244-45, 2002-Ohio-2126,

¶ 108. "[N]otice of plain error is taken with utmost caution only under exceptional circumstances and only when necessary to prevent a manifest miscarriage of justice." (Internal quotations omitted.)  *State v. Martin*, 10th Dist. No. 02AP-33, 2002-Ohio-4769, ¶ 28, quoting *State v. Hairston*, 10th Dist. No. 01AP-252 (Sept. 28, 2001), quoting *State v. Lumpkin*, 10th Dist. No. 91AP-567 (Feb. 25, 1990).

**{¶ 58}** Appellant objected to the state's motion to admit hearsay.  Appellant then renewed his objection when the trial court ruled on the motion to admit hearsay testimony.  However, when Officer Jones testified regarding Shirleen's statement "You got the right one," appellant did not object contemporaneously.  (Tr. Vol. II at 212.)  Appellant did make an objection at the end of Officer Jones' testimony; however, the objection was based on the prosecutor asking leading questions.

**{¶ 59}** Applying either abuse of discretion or plain error standards of review, we find appellant failed to demonstrate reversible error.  A statement is inadmissible hearsay when it is an out-of-court statement offered for the truth of the matter asserted.  Evid.R. 801(C) and 802.  There are exceptions to the hearsay rule listed in Evid.R. 803 and 804.  *State v. Hughes*, 10th Dist. No. 14AP-360, 2015-Ohio-151, ¶ 31.

**{¶ 60}** One of the enumerated exceptions to the hearsay rule is an excited utterance.  Pursuant to Evid.R. 803(2), "[a] statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition" is not excluded by the hearsay rule.  To be an admissible excited utterance, "(1) there must occur an event startling enough to produce a nervous excitement in the declarant; (2) the statement must be made while the declarant is still under the stress of excitement the event caused; (3) the statement must relate to the startling event; and (4) the declarant must have personally observed the startling event."  *Hughes* at ¶ 33, citing *State v. Harrison*, 10th Dist. No. 06AP-827, 2007-Ohio-2872, ¶ 17, citing *State v. Taylor*, 66 Ohio St.3d 295 (1993).  The court should also consider additional factors such as the lapse of time between the event and the statement, the mental and physical condition of the declarant, the nature of the statement, and the influence of any intervening circumstances.  *Id.*

**{¶ 61}** In this case, appellant does not contest that a startling event occurred or that the statement was made while the declarant was still under the stress of excitement the event caused or that the statement related to the startling event.  Appellant contests that

the fourth part of the test was not met, whether Shirleen personally observed the startling event.

{¶ 62} Appellant contends that Shirleen did not possess personal knowledge of the event and the record contains little, if any, proof that Shirleen witnessed appellant harming Taylor. Further, appellant argues that since Shirleen told the 9-1-1 operator she did not know how Taylor received his injuries, an inference arises that she lacked personal knowledge of the incident. However, personal knowledge can be shown by circumstantial evidence that the declarant was in the immediate vicinity of the crime. *State v. Holdbrook*, 12th Dist. No. CA2005-11-482, 2006-Ohio-5841, ¶ 46-47, citing *Miller v. Keating*, 754 F.2d 507, 510-12 (3d Cir.1985).

{¶ 63} The evidence establishes an inference that Shirleen observed the incident. Cobb testified Shirleen was present that morning and informed him that "Jake" was being beaten ("She [Shirleen] told me to come down there, Mr. Jake was being beaten. So I came downstairs, seen what I seen, went back upstairs, got my phone, called the police."). (Tr. Vol. II at 128.) Cobb then went outside and saw one of two brothers beating Taylor. Therefore, Shirleen informed Cobb during the beating and Cobb testified Shirleen was on the porch.

{¶ 64} Matthews testified he heard Shirleen yelling and went outside and saw Taylor on the ground and Shirleen on the porch steps. Matthews testified that appellant was behind Shirleen on the porch while she called 9-1-1. Officer Jones arrived within one minute of the dispatch and saw appellant leaving the scene.

{¶ 65} Further, assuming arguendo, we did find error, we cannot say that such error resulted in appellant being materially prejudiced thereby. Even excluding Shirleen's statements, as we discussed above, the conviction was not against the manifest weight of the remaining evidence. Appellant admitted to being at the scene. He also admitted he was furious with Taylor for stealing the vehicle and leaving him stranded out of town. Appellant's telephone calls from jail are evidence that appellant committed the offense. He was heard saying: "It is what it is. If I had to do it again, I would. You know, especially somebody fucking over me and mine. You know? I'd do it again. You know, with a gun, you know, all that. Use my hands and my feet. It is what it is. Okay?" (Tr. Vol. IV at 71, Call 11, Nov. 29, 2017, 8:27 a.m.) In another call, appellant stated "* * * then the last thing was this piece of metal and knock, knock, knock him dead out. You know." (Tr. Vol. IV at

54, Call 31, Dec. 3, 2017, 9:52 a.m.)  Finally, appellant admitted he was incarcerated because he had been in an "altercation."  (Tr. Vol. IV at 63, Call 194, Jan. 3, 2018, 9:18 a.m.)  Thus, we could not say that admission of the hearsay evidence resulted in appellant being materially prejudiced by the ruling or that, had the hearsay evidence been excluded, the outcome of the case would be different.

{¶ 66} Accordingly, appellant's second assignment of error is overruled.

**IV. Conclusion**

{¶ 67} For the foregoing reasons, appellant's three assignments of error are overruled and the judgment of the Franklin County Court of Common Pleas is affirmed.

*Judgment affirmed.*

SADLER and LUPER SCHUSTER, JJ., concur.